# IN THE UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re LE-NATURE'S, INC., et al., *Debtors* | Bankruptcy No. 06-25454 (MBM) <br> Chapter 11 <br> Jointly Administered |
| Federal Insurance Company, *Plaintiff* | Chief Judge M. Bruce McCullough |
| v. | Adversary Proceeding No. _____ |
| Le-Nature's, Inc., Debtor; R. Todd Nielsen as Chapter 11 Trustee for Le-Nature's, Inc.; and Gregory Podlucky, *Defendants* | |

## ADVERSARY PROCEEDING COMPLAINT FOR DECLARATORY JUDGMENT

Federal Insurance Company ("Federal"), by and through its undersigned attorneys, brings this adversary proceeding for a declaratory judgment pursuant to 28 U.S.C. §§ 1334(b), 2201, and 2202 against defendants Le-Nature's, Inc. and Gregory Podlucky to rescind a ForeFront Portfolio Insurance Policy (the "Policy") procured from Federal through material misrepresentations during the application process for the Policy. In the alternative, even assuming the validity of the Policy, Federal seeks a declaration that coverage is not available, or is limited, by Policy provisions and applicable law. In support of its complaint, Federal alleges as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1332 because there is complete diversity of citizenship between the parties, the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs, and the case is related to a case under Title 11 but does not constitute a "core" proceeding under 28 U.S.C. § 157. This adversary proceeding constitutes a "non-core" proceeding under 28 U.S.C. §

157, and Federal does not consent to entry of final orders or judgment by this Court in this proceeding.

2. Federal seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a) because it is related to a case under Title 11 that is pending in this district.

## PARTIES

4. Federal is a corporation engaged in the business of providing liability insurance. Federal is organized and exists pursuant to the laws of the state of Indiana with its principal place of business in the state of New Jersey.

5. Defendant Le-Nature's, Inc., formerly known as Global Beverage Systems, Inc. ("Le-Nature's"), is a Delaware corporation with its principal place of business in Latrobe, Pennsylvania. Le-Nature's is a company that sold bottled beverages and that is currently a debtor in bankruptcy proceedings before the U.S. Bankruptcy Court for the Western District of Pennsylvania, *In re Le-Nature's Inc. et al.*, Case No. 06-25454 (MBM).

6. Defendant R. Todd Nielsen is the duly-appointed chapter 11 Trustee for Le-Nature's. Upon information and belief, he is a citizen of California.

7. Defendant Gregory Podlucky ("Podlucky", together with Le-Nature's, "Defendants") is a citizen of Pennsylvania. He is the founder and majority shareholder of Le-Nature's, and was the chief executive officer of Le-Nature's at all relevant times.

## FACTUAL ALLEGATIONS

I. **The Procurement of the Policy**

8. Federal issued ForeFront Portfolio Insurance Policy No. 8181-1088 to Le-Nature's, Inc. and Global Beverage Systems, Inc. ("Le-Nature's") for the period from July 12, 2005 to September 12, 2006, as per Endorsement No. 2 to the General Terms and Conditions of

2

the Policy. A copy of the Policy is attached to this Complaint as Exhibit A. Subject to its specified terms, conditions, and exclusions, the Policy provided coverage for, *inter alia*, Directors & Officers Liability, Employment Practices Liability, Fiduciary Liability, Internet Liability and Crime. The Policy's Directors & Officers Liability Coverage Section ("D&O Section") contained an aggregate limit of liability of $7.5 million.

9. In order to procure the Policy, Podlucky and Le-Nature's made a variety of representations to Federal in the application process. In addition to the written application (the "Application") (copy attached as Exhibit "B"), these representations included audited financial statements (copy attached as Exhibit "C") and a warranty letter dated July 12, 2005 (the "Warranty Letter")(copy attached as Exhibit "D"), both of which were incorporated by reference in the Application. In addition, the Application incorporated by reference the materials submitted in connection with the application for the prior policy issued by Federal (collectively the "Application Materials").

10. The Application asked the applicant to state its total revenues as of the most recent fiscal year. Defendants represented that Le-Nature's total revenues in FY2004 were $228,812,363. Application, General Questions, No. 7.

11. The Application asked the applicant to state the value of its total assets as of the most recent fiscal year end. Defendants represented that Le-Nature's total assets in FY2004 were valued at $425,808,886. Application, General Questions, No. 8.

12. The Application asked the applicant to state its total cash flow from operations as of the most recent fiscal year end. Defendants represented that Le-Nature's total cash flow from operations in FY2004 was $79,954,778. Application, General Questions, No. 9.

13. The Application inquired whether Le-Nature's was in compliance with all debt and/or loan covenants. Defendants answered that question in the affirmative. Application, General Questions, No. 10.

14. The Application asked whether Le-Nature's allowed employees who reconcile the monthly bank statements to also sign checks, handle deposits or have access to check signing machines or signature plates. The Defendants represented "No." Application, Crime Section, No. 1(a).

15. The Application asked whether there were procedures in place to verify the existence and ownership of all new vendors prior to adding them to the authorized master vendor list. The Defendants represented "Yes." Application, Crime Section, No. 1(b).

16. The Application asked whether there were procedures in place to verify invoices against a corresponding purchase order, receiving report and the authorized master vendor list prior to issuing payment. The Application represented "Yes." Application, Crime Section, No. 1(c).

17. Federal required Le-Nature's to submit its most recent CPA-prepared financial statements, and Defendants furnished audited financial statements for the year ended December 31, 2004. The financial statements painted a positive picture of Le-Nature's with steady growth, a strong cash position, solid profits and the clear ability to manage its debt. Exhibit C, at 5 (representing, *inter alia*, that gross sales grew 27% to $228,812,363, gross profit grew 70% to $109,912,646, and net income grew 66% to $22,010,988).

18. Because Defendants sought to increase the limit of liability for the D&O Coverage Part from $5 million to $7.5 million, Federal also required the submission of a Warranty Letter for the increased limits. It provided as follows:

**It is important that you fill in the blank in this paragraph.** No person proposed for coverage is aware of any facts or circumstances which he or she has reason to suppose might give rise to a future claim that would fall within the scope of the proposed coverage, except: (If no exceptions, [p]lease state "No Exceptions") . . . NO EXCEPTIONS.

It is agreed that if such facts or circumstances exist, whether or not disclosed, any claim arising from them is excluded from this proposed coverage.

Warranty Letter dated July 12, 2005 (Exhibit "D").

    19.    Above the signature line, the Application states:

> The undersigned authorized agents of the person(s) and entities proposed for this insurance declare to the best of their knowledge and belief, after reasonable inquiry, the statements made in this Renewal Application and any attachments or information submitted with this Renewal Application, are true and complete. This Renewal Application supplements the application(s) for the expiring policy, and those applications together with this Renewal Application and any information attached hereto will be the basis for, and become part of, a contract should a policy providing the requested coverage be issued and shall be deemed to be attached to and shall form a part of any such policy. The Company will have relied upon such applications, attachments, and such other information submitted therewith in issuing such policy.

The application was signed by Podlucky and Dave Getzik, the Chief Financial Officer. It was dated May 3, 2005.

    20.    The Policy confirmed that Federal relied on materials furnished during the application process in issuing the Policy:

> (A)    In granting coverage to the **Insureds** under this Policy, [Federal] has relied upon the declarations and statements in the written application(s) for this Policy. Such declarations and statements are the basis of the coverage under this Policy and shall be considered as incorporated in and constituting part of this Policy.
>
> (B)    Solely with respect to any **Liability Coverage Section(s),** any written application(s) for coverage shall be construed as a separate application(s) for coverage by each **Insured Person.** With respect to the declarations and statements in such application(s):
>
> > (1)    no fact pertaining to or knowledge possessed by any **Insured Person** shall be imputed to any other **Insured Person** for the purpose of determining if coverage is available; and

5

(2) only facts pertaining to and knowledge possessed by the Chief Financial Officer, President, Chief Executive Officer or Chairperson of any **Insured Organization** or any other individual signing such application(s) shall be imputed to any **Insured Organization** for the purpose of determining if coverage is available.

Policy, General Terms and Conditions, Section XII. Thus, Podlucky's knowledge is imputed to Le-Nature's for purposes of determining the validity of the Policy.

21. The information provided and representations made to Federal in the Application process were material to Federal's decision to issue the Policy.

**II. Defendants Made Material Misrepresentations in the Application Process.**

22. Unbeknownst to Federal, the representations made to it in the underwriting process and on which it relied in issuing the Policy were, on information and belief, false. Upon information and belief, the misrepresentations were made with knowledge of their falsity and/or in bad faith.

23. The falsity of the Defendants' representations to Federal began to come to light following the filing of a shareholder lawsuit filed in May 2006 in Delaware Chancery Court (the "Underlying Litigation") by George K. Baum Capital Partners ("GKB") and SW Pelham Fund ("SWP", together the "Outside Shareholders"), who owned 45 percent of Le-Nature's voting stock. In that regard, disputes over the potential sale of the company and over certain capital expenditures led GKB and SWP to sue Le-Nature's and Podlucky, his brother Jonathan Podlucky, Andrew Murin and Robert Lynn (the "Inside Directors") in May 2006.

24. On June 6, 2006, the Delaware court issued a preliminary injunction (the "Injunction") restraining the company and the Inside Directors from incurring non-ordinary course capital expenses without the Outside Shareholders' consent, including a purportedly planned construction of a plant in Florida, and requiring advance notice to the Outside

6

Shareholders of any proposed transaction that would obligate the Company for more than $1 million.

25. Based upon evidence of fraudulent activities at Le-Nature's presented by GKB and SWP and several apparent violations of the Injunction, the Delaware court granted a temporary restraining order (the "TRO") on October 20, 2006, that effectively froze the company's finances and required the Inside Directors to turn over material to Le-Nature's outside auditor for safekeeping and otherwise to preserve all documents and evidence. After a hearing on October 27, 2006, the court entered an order (the "Custodian Order," attached hereto as Exhibit "E") appointing Kroll Zolfo Cooper LLC ("KZC") as the custodian for the company. The Custodian Order authorized KZC to take any action necessary to preserve the company's assets and property.

26. The Custodian Order states that "the evidence plaintiffs have presented of breaches of fiduciary duty, violations of the Preliminary Injunction Order and the Temporary Restraining Order, and the preparation and use of forged and falsified documents by one or more of the Individual Defendants has not been rebutted by defendants." Custodian Order, Exhibit "E", par. G. The Court found "extremely strong and unrebutted evidence of forgery of important commercial documents" and that appointment of a custodian was warranted because of "unrebutted evidence of breaches of fiduciary duty, of this Court's preliminary injunction order, and of forged transactional documents . . . " (October 27, 2006 transcript, attached hereto as Exhibit "F"), at 1, 10. According to the court, "[t]here is more than a reasonable probability . . . that there have been grotesque improprieties that would justify the appointment of a custodian or receiver." Exhibit "F" at 4. The Court also noted "a strong sense" that a set of board minutes

that Podlucky submitted to the Court with a sworn affidavit of authenticity were created after the fact to support the Inside Directors' story. Exhibit "F" at 4.

27. The Custodian Order was entered shortly after 5:00 p.m. on the afternoon of October 27, and KZC took possession of the Latrobe Plant at approximately 5:30 p.m. Company employees told KZC that they had witnessed Podlucky and others shredding documents in the days following entry of the TRO. They said they witnessed a dump truck unloading large volumes of documents into a trash compactor over the weekend of October 21 and 22 (just after the TRO was entered). One employee reported seeing Podlucky's bodyguard taking 4-5 trips per hour to the trash compactor, with 4-5 boxes per trip, between 1:00 and 5:00 p.m. on October 27, the day KZC arrived on the premises.

28. KZC's investigation revealed that Le-Nature's maintained multiple sets of financial books and records, which revealed a financial reality that contrasted starkly with the positive financial picture set forth in the Application Materials. For example, the company's 2005 audited financial statements showed annual revenues of $275 million, but KZC found information showing that the 2005 revenue was actually as low as $32 million. KZC also found that the company was in a severe cash crunch. KZC first reported that as of October 30, 2006, the company had $1.8 million in available cash reserves against outstanding checks in the amount of $2.9 million. KZC recently filed a pleading stating that the actual cash on hand was $987,000. Response Regarding the Hearing on 12/19/06 Filed by Kroll Zolfo Cooper LLC, Docket No. 419, p. 4.

29. An accounting department employee told KZC that the 2005 audited financial statements were based upon books and records that had been falsified at Podlucky's direction in order to meet certain revenue targets.

30. Federal investigators also reportedly found a secret room accessible only through a cleaning closet, safes holding stashes of precious gems, and more than $1 million in gold watches.

31. On November 1, four unsecured trade creditors filed an involuntary petition for bankruptcy relief in the Western District of Pennsylvania, allegedly at the instigation of Podlucky. On November 3, the bankruptcy court converted the case to Chapter 11 and appointed Salvatore LoBiondo of KZC as responsible officer of Le-Nature's.

32. KZC continued to find evidence of fraud after the bankruptcy was filed. On November 7, KZC informed the bankruptcy court of the need to shut down the Phoenix plant. This facility alone had monthly lease obligations in excess of $2,750,000, or approximately $32,500,000 annually – more than the actual combined net sales for the entire company in 2005. Le-Nature's then shut down the Latrobe plant on November 13 and furloughed its entire work force.

33. At a hearing on November 29, LoBiondo reported that Le-Nature's had no business to reorganize, that a criminal investigation is ongoing, and that U.S. Postal Inspectors have set up shop at the Latrobe plant to interview employees and review financial documents related to allegations of fraud. LoBiondo said he continues to find fraudulent entries in the books, all of which make the revenue numbers appear even lower, as reflected in this colloquy from a November 29, 2006 hearing in the bankruptcy court:

> MR. LOBIONDO: . . . We continue to find fraudulent entries in the books and records of the company . . .
>
> THE COURT: But the bottom line is all the bad data makes the numbers get smaller?
>
> MR. LOBIONDO: Yes.

> THE COURT: Any data that makes the numbers go higher?
>
> MR. LOBIONDO: No.

LoBiondo further reported that Le-Nature's sold beverages for less than they cost to produce; that the plant was operating below capacity; and that the company made payments on cheaper, long-term debt from more expensive, short-term financing.

34. According to recent press reports, a former Chief Financial Officer raised internal questions about Le-Nature's accounting as early as 2003. The news reports state that then-CFO John W. Higbee questioned Podlucky's revenue figures, and the board of directors reportedly authorized an investigation. According to the press reports, Higbee questioned whether several of Le-Nature's supposed customers existed:

> "Two North Carolina firms that Le-Nature's sold tea concentrate to didn't exist at all," Higbee said. "The address of one customer came back as a Colorado cleaning service," he said. He said the results of the internal probe were presented to the board of directors.

Higbee apparently resigned in August 2003. Neither Higbee's concerns nor the existence or results of any internal probe were reported to Federal in any of the Application Materials.

### III. Defendants' Misrepresentations Void the Policy.

35. Based upon the evidence set forth above, it is clear that Defendants made multiple misrepresentations that were material to Federal's decision to issue the Policy, and that the Policy therefore is void *ab initio*.

36. KZC has reported that the Company claimed revenues of $275 million in 2005, but that the actual revenues for 2005 were closer to $32 million or less. KZC reported that the fabricated revenue figures were supported by financial records that were falsified by or at the direction of Podlucky. Under the circumstances, Le-Nature's claim in the Application of over

$228 million in sales, nearly $110 million in gross profit, and over $22 million in net profit in 2004 must have been grossly and knowingly overstated.

37. Similarly, the representations about total assets, cash flow from operations, profits and cash on hand in FY2004 necessarily must have been false in light of the information regarding FY2005 that has now emerged.

38. Further, given the apparently dire financial condition of the company in 2005 at the time the Application was completed, the representation that Le-Nature's was in compliance with all debt and/or loan covenants is necessarily suspect.

39. In light of KZC's discovery of multiple financial records, some of which were allegedly falsified at Podlucky's direction, the representations about internal controls over financial procedures and bank accounts necessarily must have been false. Indeed, given the former CFO's statements about sales recorded to non-existent customers, the representation in the warranty letter and the representations about internal controls over invoices and vendors must have been knowingly false.

40. Le-Nature's warranty statement disavowing knowledge of any facts or circumstances that might give rise to future claims clearly also was false because at that time Le-Nature's apparently was maintaining a set of false financial records and grossly misstating its financial position to investors and lenders. These circumstances clearly could have given rise to future claims.

41. The violations of the Delaware court orders, the apparent large-scale destruction of documents and the Delaware court's findings of evidence that Podlucky submitted false affidavits and fabricated documents only reinforce the conclusion that Podlucky was attempting to hide Le-Nature's true condition and apparently illegal activities at the company.

42. Defendants' misrepresentations were material. Had Federal known the true facts, it would not have issued the Policy to LeNature's, let alone increase the limit of liability.

43. As a result of the material misrepresentations in the Application process, the Policy is void *ab initio*.

44. In order to effectuate the rescission, Federal advised the Trustee that it had deposited the premium for the Policy in an escrow account and was prepared to tender a check in the amount of the premium to the trustee on behalf of LeNature's. Trustee's counsel advised that the trustee would not negotiate the check for the return premium, which will therefore remain in the escrow account pending resolution of this action or further order of a court; that Federal had satisfied any obligation to tender the premium in order to effectuate the rescission; and that the trustee would not contend that Federal had waived any rights by virtue of the agreement to maintain the amount of the premium in the escrow account in lieu of tendering a check in the amount of the premium.

## ADDITIONAL RELEVANT POLICY PROVISIONS

45. Even assuming the validity of the Policy, coverage for the Underlying Litigation is precluded or limited due to other provisions of the Policy and applicable law.

46. The Policy only affords specified coverage for "Loss," as that term is defined. Certain matters fall outside the definition of "Loss," including "matters uninsurable under the law pursuant to which this Policy is construed" and "taxes, fines or penalties imposed by law, or the multiple portion of any multiplied damage award." Policy, D&O Coverage Part, Section II.(L). Pennsylvania public policy precludes coverage for intentional acts. It also precludes coverage for known losses.

47. The Policy contains a dishonesty exclusion, which provides:

No coverage will be available under this Coverage Section for any **Claim** against an **Insured** . . . based upon, arising from, or in consequence of any deliberately fraudulent act or omission or any willful violation of any statute or regulation by such **Insured**, if a final and non-appealable judgment or adjudication adverse to such **Insured** establishes such a deliberately fraudulent act or omission or willful violation.

Policy, D&O Coverage Part, Section III.(A)(10).

48. The Policy contains a profit or advantage exclusion that provides:

No coverage will be available under this Coverage Section for any **Claim** against an **Insured** . . . based upon, arising from, or in consequence of such **Insured** having gained in fact any profit, remuneration or financial advantage to which such **Insured** was not legally entitled.

Policy, D&O Coverage Part, Section III.(A)(11).

49. The Policy contains a cooperation clause that provides:

The **Insureds** agree to provide the **Company** with all information, assistance and cooperation which the **Company** reasonably requests and agree they will do nothing that may prejudice the **Company's** position or its potential or actual rights of recovery.

Policy, General Terms and Conditions Part, Section IX.(B).

50. The Delaware court found evidence of the submission in the Underlying Litigation of intentionally falsified board meeting minutes, false affidavits in support of those minutes, and fabricated documents submitted to gain control over millions of dollars. KZC has reported allegations of massive document destruction, falsified financial books and records, and vastly overstated revenue figures. The federal investigation has reportedly uncovered a hidden room and hidden safe containing valuable watches and jewels including a diamond valued at more than $1.5 million.

51. Moreover, the Defendants appear repeatedly to have violated the Delaware court's Injunction and TRO; misled the Delaware court with respect to the company's expenditures and activities in Florida; and shredded documents in violation of court orders.

52. The exclusion in the warranty letter dated July 12, 2005 bars coverage with respect to the limit of liability of $2.5 million excess of $5 million for claims arising out of circumstances existing as of that date that an insured has reason to suppose might give rise to a claim.

53. As a result of the foregoing, the cited Policy provisions apply or may apply to limit or bar coverage altogether.

## CONTROVERSY AND RIPENESS

54. Based on the material misrepresentations made to Federal during the underwriting process, which were material and made with the intent to deceive or in bad faith, Federal is entitled to rescind coverage available to Le-Nature's and Podlucky under the Policy. Alternatively, even assuming the validity of the Policy, other Policy terms and conditions bar or limit coverage.

55. Defendants have taken the position that they are entitled to coverage under the Policy.

56. The issues raised in this complaint will directly govern Federal's obligations under the Policy. This matter is therefore ripe for an adjudication.

## COUNT I

## DECLARATORY JUDGMENT
## THAT THE POLICY IS RESCINDED AS TO LE-NATURE'S

57. Federal repeats and realleges the allegations set forth above.

58. The information provided to Federal on the Application and in the Application Materials was false and constituted misrepresentations that were made with an intent to deceive Federal or in bad faith. The misrepresentations were also material to the acceptance of the risk assumed by Federal.

14

59. Federal relied on the misrepresentations in connection with its decision to issue the Policy, and that information substantially affected its decision to issue the Policy. Had Federal known the true facts, it would not have issued the Policy or would have issued the Policy upon different terms, different limits, or at a different premium.

60. Upon information and belief, Podlucky, the CEO, was responsible for and knew of the facts misrepresented when he signed the Application.

61. Federal has tendered the premium paid by Le-Nature's for the Policy to Le-Nature's in order to effectuate the rescission, but, upon information and belief, Le-Nature's will not accept that tender.

62. Federal timely seeks the relief requested in this Count I.

WHEREFORE, Federal requests that this Court enter a declaratory judgment in its favor declaring that the coverage under the Policy for Le-Nature's is rescinded and void *ab initio*.

## COUNT II

### DECLARATORY JUDGMENT THAT THE POLICY IS RESCINDED AS TO PODLUCKY

63. Federal repeats and realleges the allegations set forth above.

64. The information provided to Federal on the Application and in the Application Materials was false and constituted misrepresentations that were made with an intent to deceive Federal or in bad faith. The misrepresentations were also material to the acceptance of the risk assumed by Federal.

65. Federal relied on the misrepresentations in connection with its decision to issue the Policy, and that information substantially affected its decision to issue the Policy. Had Federal known the true facts, it would not have issued the Policy or would have issued the Policy upon different terms, different limits, or at a different premium.

66. Upon information and belief, Podlucky, the CEO, was responsible for and knew of the facts misrepresented when he signed the Application.

67. Federal has tendered the premium paid by Le-Nature's for the Policy to Le-Nature's in order to effectuate the rescission, but, upon information and belief, Le-Nature's will not accept that tender.

68. Federal timely seeks the relief requested in this Count II.

WHEREFORE, Federal requests that this Court enter a declaratory judgment in its favor declaring that the coverage under the Policy for Podlucky is rescinded and void *ab initio* and awarding Federal reimbursement of defense costs advanced to Podlucky.

## COUNT III

### DECLARATORY JUDGMENT REGARDING COVERAGE DEFENSES

69. Federal repeats and realleges the allegations set forth above.

70. Coverage for the Underlying Litigation may be barred by other terms and conditions of the Policy even if the Policy is not void *ab initio*. Such provisions include, but are not limited to the following:

(a) The Policies' definitions of "Loss" and Pennsylvania law preclude coverage for loss arising out of intentional acts and/or claims arising out of known losses.

(b) The exclusion in the July 12, 2005 warranty letter precludes coverage for Loss associated with any portion of the Underlying Litigation that is $2.5 million excess of $5 million.

(c) The Policy's dishonesty exclusion may preclude coverage for the Underlying Litigation in its entirety.

(d) The Policy's profit or advantage exclusion may preclude coverage for the Underlying Litigation in its entirety.

(e) Coverage may be precluded or limited by the Defendants' failure to comply with the Policy's Cooperation Clause.

WHEREFORE, in the event that the Court determines that the Policy is not void, Federal requests that the Court declare that coverage is limited or precluded by applicable Policy provisions and applicable law.

## **RESERVATION OF RIGHTS**

The Policy contains terms, conditions, and limitations on coverage that are relevant to the Underlying Claim but that are not implicated by this declaratory judgment action. Nothing in this complaint should be construed as a waiver by Federal of any coverage defenses under the Policy, and Federal reserves the right to raise all other Policy terms and conditions as defenses to coverage for any claim made under the Policy, including the Underlying Claim, as appropriate.

FOR ALL THE FOREGOING REASONS, Federal requests that the Court enter a declaration and judgment in its favor:

71. Declaring that, for the reasons set forth in Counts I and II, the Policy is void with respect to any coverage available to Le-Nature's and Podlucky, and that, as a consequence, Federal has no obligation under the Policy, including for the Underlying Claim, and is entitled to reimbursement of defense costs advanced to Podlucky through the date of the Court's ruling;

72. Alternatively, declaring that, for the reasons set forth in Count III, coverage is precluded or limited as to Le-Nature's and Podlucky under various Policy provisions and applicable law;

73. Awarding Federal such additional declaratory and other relief as shall be found to be appropriate under the circumstances; and

74. Awarding Federal its fees and costs incurred in prosecuting this action.

Respectfully submitted,

By: /s/*Dennis St. J. Mulvihill*
    Dennis St. J. Mulvihill, Esquire
    Mark A. Martini, Esquire
    ROBB LEONARD MULVIHILL
    2300 One Mellon Center
    Pittsburgh, PA 15219
    412-281-5431

    Of Counsel:
    Daniel J. Standish, Esquire (pro hac vice)
    Charles C. Lemley, Esquire (pro hac vice)
    WILEY REIN LLP
    1776 K Street, NW
    Washington, DC 20006
    (202) 719-7000
    (202) 719-7049 (facsimile)

    *Attorneys for Plaintiff Federal Insurance Company*

    Dated: March 30, 2007