**Exhibit F**

```
1       ROUGH RULING IN BAUM V LE-NATURE'S ON 10/27

2               THE COURT:  This is a regrettable day.

3  I mean, it was an unusual situation, I will say.  As

4  the defendants know, this Court is probably among the

5  most reluctant courts anywhere -- if there is a court

6  anywhere in the country more reluctant to hold ex
```

7  parte proceedings, I'm not sure where it is.  We don't

8  lightly do that.  And I am particularly vigilant about

9  insisting that folks give notice.  So when I entered

10  the TRO, it was with that mind-set, and it was a very

11  unusual thing.  But I was presented with extremely

12  unusual evidence.  And I still -- and I scheduled this

13  today because, obviously, the company -- the insiders

14  needed to be given an opportunity to explain.

15          Frankly, the sophistry -- sophistry is

16  not going to cut it, the idea that I can sort of --

17  you can sort of make someone whole out of other

18  accounts and explain away what, as of this date, is

19  extremely strong and unrebutted evidence of forgery of

20  important commercial documents.  I don't know where

21  you can get away with that kind of nonsense.  Maybe on

22  a soap opera in the afternoon, some hypothetical

23  trial, but not in the Delaware Court of Chancery, and

24  certainly not in any federal court that I have ever

1  heard of.

2          When a company like AIG has an

3  equipment financing line, and when their security is

4  in the equipment to be financed, you know, one would

5  think it would be passing strange for them to push a

6  button and transmit tens of millions of dollars to the

7  equipment manufacturer, only for the equipment

8  manufacturer to turn around and send the bulk of the

9  money back to the company for whom the equipment was

10  being made as cash.  The commercial circumstances in

11  which AIG -- and that's why I -- AIG would do that, it

12  doesn't make any sense to me.  If AIG just wanted its

13  money back, without any kind of interest, or it wanted

14  to fund a revolver, AIG may have a financing arm that

15  funds revolvers.  There are people -- Citigroup, other

16  kinds of groups -- that fund revolvers for

17  corporations.  They have certain terms, and they are

18  probably different than the terms that are given by

19  equipment financing entities.

20         I mean, I just am trying to figure out

21  the commercial logic for AIG.  You push the button,

22  yes.  Push the button on, say, the one with the

23  13 million.  "We are going to give you 13 million,

24  Krones, and we are going to allow 11 million of the

1  money we just sent out, or so, to go right back to the

2  company."  I don't really get it.

3         So commercially, it doesn't make a lot

4  of sense.  Then we have a situation where no one has

5  come forward from the company to really deny this.

6  And you have a September 1 letter, with Mr. Gensor's

7  supposed signature on it, that is agreed to by

8  Mr. Podlucky before a notary.  There is no need for

9  Mr. Podlucky to go to Germany.  Has nothing to do with

10  Germany.  Wasn't even sent to Krones in Germany.  It

11  was sent to Krones in Wisconsin.

12         An AIG letter agreed to by

13  Mr. Podlucky makes its way to Krones.  This isn't even

14  that long ago.  September 1st.  I have got nothing

15  coming back indicating, "I remember signing this

16  before the notary.  This was brought to me by staff

17    who heard from Mr. Gensor, who said, 'We need to get

18    this out to Krones.'"  Nothing.

19              And even if AIG is later made whole,

20    somebody has got to explain, if that was forged.  If

21    it was forged, it would be utterly irresponsible for

22    this Court of equity to leave, in this situation, with

23    a hotly contested control contest -- to leave folks

24    who had forged documents in control of a Delaware

1     entity.  Start with that one.  There is more than a

2     reasonable probability of success on the merits with

3     respect to the claim that there have been grotesque

4     improprieties that would justify the appointment of a

5     custodian or receiver.

6               In my order, I did not take lightly

7     having an oral argument and reading things and

8     discussing capital -- large capital expenditures which

9     were -- which the plaintiffs put on strong evidence

10    were in violation of their contractual rights, and

11    which were -- which were being implemented by the

12    incumbent management without the approval of the full

13    board, when there is a strong sense that there was an

14    after-the-fact preparation of a board minute to

15    reflect what people wished would have been the state

16    of affairs, but was not -- have an entire oral

17    argument about this; put in place a preliminary

18    injunction order that required the defendants to give

19    notice with respect to capital expenditures and to --

20    and this is very important -- to honor the obligations

21    they had to directors, in the ordinary course, to

22 provide them with material information, only to find

23 out that was entirely hypothetical; that I was

24 involved -- without Mr. Manwaring's even knowledge,

1 his clients had us all involved in a moot court,

2 whereby some Fantasy Island story -- we didn't even

3 get to see Tattoo, but we had Fantasy Island. But it

4 was really more Nightmare Island, where Mr. Manwaring

5 would get up and say a bunch of nonsense, because in

6 fact, the decision had already been made to pull out

7 of Jacksonville and head for Phoenix.

8         And then when it's turned out now that

9 supposedly the company is going to be spending -- the

10 company is going to be spending 65, $75 million in

11 Phoenix, "But that decision was already made in May.

12 Therefore, Your Honor, it wasn't a violation of your

13 order, because we just basically told you a bunch of

14 nonsense before. So, you know, your order didn't

15 apply, because we had already -- we had already moved

16 the stuff. No, we didn't tell the independent

17 directors, and they never approved of this." And this

18 is a business, by the way -- appears to be a healthy

19 business, but they had a situation where they opened

20 two new production lines in its major facility. It's

21 just an "Oh, by the way." It's not like members of

22 the board of directors aren't entitled to information

23 about that.

24         It's not like it's not a breach of

1 fiduciary duty, obviously, by the CEO, to be making

2  those sorts of decisions in isolation, without

3  informing the board, particularly when he knows that

4  members of the board have concerns about the capital

5  investments of the company.  It's also not appropriate

6  for incumbent managers of a company, confronted with a

7  preliminary injunction order presented to them by

8  qualified counsel, to not call -- tell counsel "What

9  we have told you to tell the Court is fiction."

10            Mr. Podlucky should have told

11  Mr. Manwaring, "I have put you in an awful situation."

12  I'm not even sure, frankly, Mr. Manwaring -- and I'm

13  not asking you to address this, but -- I have a great

14  deal of respect for the Pepper firm.  It's a

15  long-standing firm.  This one, I can't even imagine --

16  I would have had to have a restraining order, myself,

17  against myself, for not going after my client.  I

18  mean, I was here.  I remember that discussion.  I

19  remember talking about the just-in-time thing, and "We

20  needed to get a plant closer to where people buy

21  Le-Nature's products," and all that stuff.  I know

22  exactly the context for this.  I took the time to read

23  all the documents from Mr. Podlucky and the people at

24  Le-Nature's that were submitted in rebuttal to the

1  plaintiff.  Not one of them said, "We have already

2  moved to Phoenix.  They are plumb out of luck.  We

3  have a technical reason why we didn't breach the

4  contractual rights."  Doesn't say that.

5            I also am not clear -- I actually

6  think I'm pretty clear that my preliminary injunction

7   order doesn't really let them escape that much.  I

8   mean, we also had the undisputed "settle the lawsuit"

9   without complying with the order.  It's not clear to

10  me, at all, how Krones going on to manufacture

11  equipment for the second line is not going to incur

12  liability of a million dollars or more, how this was

13  not discussed at the board.  I think there has just

14  been an entire wholesale flouting of this Court's

15  order and of the fiduciary obligations that the

16  members of the board owe to each other.

17          So in terms of any kind of merits

18  determination, seems to me there is clear, basically

19  unrebutted, evidence of potential criminal conduct,

20  forgery, that would justify the order; basically,

21  undisputed evidence of breaches of my order and

22  undisputed evidence of breaches of fiduciary duty

23  regarding the information that has to be shared with

24  fellow directors and, frankly, regarding the

1   managerial rights of the directors, which is for the

2   protection of stockholders.

3          CEOs are not allowed to go around and

4   just willy-nilly change business plans knowing that

5   the board has concerns about it, knowing it's

6   material.  There is also this nonsense about how you

7   can't close the books and records for the company, so

8   essentially, during the period when the preliminary

9   injunction order is in effect, any of the -- any of

10  the kind of ordinary P&L statements can't be relied

11  upon.  That is nonsense.  So as long as the defendants

12 essentially don't close the books and records, they

13 can do anything they want during that period and claim

14 it as an excuse?

15          This is an extraordinary situation.

16 In terms of the balancing of the equities on this,

17 they are really clear.  I have absolutely no

18 confidence that my order will be honored, that there

19 is any reasonable way to protect the company or its

20 constituents without the entry of an order.  There is

21 no countervailing public interest here, because, you

22 know, basically the defendants say, "Give us time to

23 work around the Fifth Amendment and to come up with

24 some excuse that won't even directly rebut the

1 allegation of forgery, but will essentially say, "We

2 can make one of the entities that was victimized, if

3 there was forgery, whole, and maybe then we can escape

4 responsibility."

5          Yeah.  Maybe there are people in the

6 outside world who are paid to do that.  They are

7 called white collar criminal attorneys.  The job of

8 the judiciary, obviously, is not to be enlisted on the

9 defense team and to allow folks time to create anymore

10 -- even more harm while that kind of maneuvering is

11 going on.

12          So I'm going to enter this order.  I

13 do want some alterations.  I think I have said enough

14 about the merits here, that there is a -- if you want

15 to say there is a mandatory injunction standard in

16 here, I think it's satisfied.  I don't think, given

17 the affidavit testimony from AIG, the inability of

18 Mr. Podlucky to even address the September 1 letter,

19 despite the fact that he can say many things about

20 how, you know, he will get them their money -- I

21 consider that, essentially, unrebutted evidence.

22 There is unrebutted evidence of breaches of my order.

23 So if you want to say mandatory injunction standard;

24 satisfied.  And certainly any preliminary injunction

1 standard is satisfied.

2          So I think we should just reference

3 that, Mr. Clark -- that it's basically been determined

4 that there has been unrebutted evidence of breaches of

5 fiduciary duty, of this Court's preliminary injunction

6 order, and of forged transactional documents; that for

7 the reasons stated in this Court's oral opinion, just

8 warrant the relief, and then we will leave it at that.

9          With respect to -- I'm happy to call

10 it a custodian, if that does it.  The custodian is

11 going to have the full powers to run the business.  I

12 think there should be something -- the question is --

13 and what I would like is to put in place something,

14 and to have the custodian come back to me and comment

15 on the order.  You know, the issue is raised, for

16 example, with respect to things like whether the

17 defendants are going to continue to get paid or not.

18 I don't know whether -- I don't want to invite --

19          I don't want to invite a sort of every

20 day, every week I have a Le-Nature's conference call

21 about what is going on at the business.  The custodian

22   is going to run the business.  The question is what do

23   we do with out-of-the-ordinary kind of proposals that

24   have to be made, and how that should be done.  I would

1    think we need to -- what we need to do is get in place

2    an order immediately, because -- and I say right now,

3    orally, to Mr. Manwaring and his colleagues, you had

4    better get ahold of your clients and basically tell

5    them, "Don't be doing anything.  There is already a

6    TRO order in place."  But it seems to me, in the first

7    instance, for some out-of-the-ordinary issues, the

8    receiver/custodian should try to go to the board in

9    the first instance, see if there can be agreement, but

10   that if not, may have to come to me, with a heavy

11   presumption that I'm going to give the receiver/the

12   custodian deference.

13              The custodian is going to be able to

14   exercise, under business judgment rule, what it does.

15   It's not going to be -- I'm not going to sit around

16   and have appeals.  For example, if the custodian

17   decides to interview top management and they take the

18   Fifth Amendment with respect to the September 1

19   letter, don't expect me, if the custodian says, "I'm

20   stopping paying them" -- don't expect I'm going to

21   overturn that judgment.

22              MR. CLARK:  Your Honor, may I ask a

23   question?

24              THE COURT:  No.  Let me finish.

1        One of the principal virtues of this
2   is that we can have a rational time to talk about a
3   January trial.  That is kind of, actually, an
4   oxymoron.  There is probably no rational way to
5   proceed that isn't going to ruin the holidays of the
6   lawyers involved.  I think what we can have is a
7   custodian in place who sort of runs this business.
8   Let's have a final trial.  No use having another
9   injunction proceeding.  I think the custodian -- one
10  of the first jobs of the custodian is to get its own
11  counsel.  The custodian, I will put on the record, is
12  responsible to the Court and to the constituency of
13  the company as a fiduciary.  The plaintiffs are going
14  to have to kind of step back, themselves.  They will
15  be directors.  They will get information.
16       I'm going to go with their choice not
17  because it's their choice so much as it's a qualified
18  receiver, it's a reputable firm, and we need to get
19  going.  I want the custodian -- I think we probably
20  ought to have a status conference within ten days,
21  where the custodian appears with outside counsel, so
22  we can get an order -- I want the custodian to have
23  the ability to comment on the order, us to have a
24  conference.

1        And look, I am not here to take sides
2   in this dispute.  That is not what the Court is doing.
3   What we are trying to do is to maintain the status quo
4   in a way that can allow you to have your fight.
5        I am going to terminate the stay of

6  the litigation.  I don't know -- I think if the

7  company -- if the defendants want to fight about the

8  fact that they would have been able to close, you

9  know, they can fight about that.  I have kind of grave

10 doubts that they would have been able to close, given

11 the time line that was presented involving Wachovia,

12 which doesn't have closing occurring by the deadline.

13 There is also this other thing, which is it's not

14 entirely clear to me that a person operating in good

15 faith could responsibly close a transaction of the

16 magnitude contemplated by the settlement agreement

17 until the concerns raised by AIG were resolved.  I

18 don't know.

19          Selling a business and having a fairly

20 major financing company saying, "Well, there are these

21 couple of multi-million dollar transactional documents

22 that have come to light that weren't actually signed

23 by anyone at our company, but we are going to close

24 this deal, anyway" -- maybe that is why I'm a judge.

1  I'm not quite as gutsy as some people in the

2  transactional world.  But I have my doubts.  And you

3  can have a fair fight about that.  If Mr. Podlucky and

4  his friends are right and the deal should not have

5  been terminated, we can find that out at a trial.  But

6  we are going to terminate the stay, and you can all

7  talk about a schedule.  I think we are talking about

8  trial, probably, early January.

9          Obviously, we have got -- Mr. Williams

10 intervened, or -- Mr. Williams, the lawyer, actually

11  filed an intervention on behalf of the person on the

12  $5 million settlements, so we have more people.  But I

13  guess what I'm saying, though -- and I want to

14  emphasize this to Mr. Clark and his clients.  I'm

15  appointing Kroll.  Kroll is then a fiduciary.  Kroll

16  needs to get its own lawyers to, essentially, act as

17  company counsel.  I don't --

18              Frankly, Mr. Manwaring, the fact that

19  your firm may now have to be paid by the

20  independent -- individual defendants is something the

21  receiver is going to talk about.  There are insurance

22  contracts and other things, probably D&O insurance

23  that Mr. Podlucky has, and you better explore that.

24  Mr. Clark, be reasonable about this.  I don't want to

1  have a hostage taking.  I don't want emergencies.  But

2  there is going to be a transition here.  The receiver

3  is going to run the business, and it's going to be a

4  difficult time.  This is not ideal.

5              Go ahead, Mr. Manwaring.

6              MR. MANWARING:  Your Honor, in terms

7  of -- if the -- just a question.  If the custodian is

8  running the company and have their own counsel -- up

9  to now, I have represented the company and the inside

10  directors, in their capacity as such.  Now, can I --

11  I'm at a loss.  Can I continue to represent -- I don't

12  represent the company anymore.

13              THE COURT:  But guess what?

14              MR. MANWARING:  Can I continue, now?

15  I have been exposed to confidential stuff on both

16   sides of the --

17               THE COURT:  I'm not your ethics

18   counsel.

19               MR. MANWARING:  I know.

20               THE COURT:  I have been to enough -- I

21   have been -- I was counsel to, you know, the chief

22   executive of the state, and I have been involved in a

23   fair amount of CLE programs on crisis management and

24   other sorts of things.  The reality is, Mr. Manwaring,

1    I think when you and your colleagues -- if you

2    listened to the oral argument today, at the time when

3    you are sitting around figuring out how to respond and

4    taking into account the potential for criminal

5    sanctions against individuals, you already -- you were

6    already across the Alleghney on that.  I mean -- and

7    you all, as a firm, have probably got a choice to

8    make.  And the reality is you have not -- you are

9    representing the incumbent management in a factional

10   fight, and you can make your choices.

11               What I'm saying to Mr. Clark is -- and

12   I will say to the custodian -- I don't want some sort

13   of emergency thing done, but the reality is if the

14   custodian has to hire counsel, they are going to hire

15   counsel.  And they are required.  I'm requiring them

16   to get counsel.  They are going to -- and if you --

17   you probably have got your choice.  It comes often

18   with these rules, which is if -- if you want to

19   represent Mr. Podlucky, and that's really been your

20   man, then you can probably continue to do that.

21  Frankly, you probably have a duty to think about which

22  side of this you are on, given the criminal

23  implications that have been raised.

24            MR. MANWARING:  For purposes of this

1   ruling, I don't represent the company anymore, as of

2   today, because you are appointing them and telling the

3   custodian to get their own counsel.  As of this ruling

4   today, I am not the company's counsel.  I'm asking for

5   clarification.

6            THE COURT:  No.  I said -- if the

7   custodian wishes to hire you, I suppose it -- he or

8   she is free -- I think it's an it if it's Kroll.  I

9   don't know what we do, the person, whatever it is.

10  You guys can talk about that.  I think it's an

11  unlikely choice.  Just as I said, I think it's

12  unlikely they would hire Mr. Clark.  The custodian has

13  to do what it has to do.  Its job is to make sure the

14  corpus is intact, to get the basic integrity issues

15  dealt with and the corpus remains viable so your

16  clients can fight about the remains.

17            I'm not sitting here terminating you

18  all as company counsel from the bench, but if you want

19  me -- to the extent you want my guidance, do I think

20  that there is -- it's fairly elementary that there is

21  the potential for a fairly serious conflict of

22  interest between Mr. Podlucky and the company if he is

23  the one who signed this September 1 contract, and if

24  it in fact never was sent to him by AIG, or there is a

1 possibility that that -- that it never was, and if he

2 is sufficiently exposed to criminal culpability that

3 he can't file an affidavit addressing that simple

4 fact, the circumstance of his creation?  I would be

5 willing to venture that is probably elementary, that

6 he has something to think about.

7                    MR. MANWARING:  Just one other

8 clarification.  Will the individual defendants, as

9 part of this custodianship, have access to the records

10 to defend themselves?

11                    THE COURT:  I think the custodian is

12 going to be a custodian of the books and records of

13 the company.  The custodian will not -- will make the

14 determinations that a fiduciary would make.  The

15 directors of the company ordinarily have access to the

16 books and records.  But the custodian is going to

17 control them.  There will, obviously, be discovery.

18 No, they are not going to be sitting inside, probably.

19 The custodian will determine whether Mr. Podlucky

20 comes to work Monday.  I think it's going to be a

21 fairly unusual decision, to be honest, if the

22 custodian decides he ought to be sitting in the big

23 office and be able to hack away on the computer.  And

24 he is already not supposed to be destroying evidence.

1 And I don't see any reason why the custodian is going

2 to be spoliating evidence.  That would be a fairly bad

3 thing for a firm like Kroll to do, if it wants to be a

4 turn-around specialist in bankruptcies and other kinds

5 of things, where there are all kinds of constituencies

6   that have an interest in the preservation of evidence.

7   The answer is, I think, in the end, yes, just like

8   Mr. Clark's clients would.

9               I think your clients can take solace

10  in the fact that they have -- obviously, despite the

11  coequal rights of the other members of the board to

12  have information about the company, your clients know

13  far more about what is going on there than anybody.

14  They will probably -- that will probably start to even

15  out after today.

16              MR. MANWARING:  Thank you.

17              MR. CLARK:  Your Honor, just a couple

18  of questions for clarification.

19              If I understand what the Court has

20  said, we will add a paragraph in here providing for a

21  status conference in ten days before the Court, at

22  which, among other things, the custodian and his

23  counsel can come in and comment on the order, as to

24  whether it needs to be modified or altered in some way

1   they think is appropriate.

2               If I heard you correctly, if the

3   custodian thinks that it is appropriate for the

4   company to do something that -- and I'm not using this

5   as a term of art, but do something that is out of the

6   ordinary course, if you will, that he would first go

7   to the board of directors as is currently comprised,

8   make a proposal, and if after conferring with the

9   board there is some issue there, then he can come to

10  the Court and seek direction from the Court.

11          THE COURT:  Yeah.  As I understand the

12     way you have written the order now, essentially,

13     nobody can do anything with respect to the company

14     without the receiver's approval.

15          MR. CLARK:  Correct, Your Honor.

16          THE COURT:  I'm imagining a situation

17     where the receiver may want to do something.  I have

18     no problem with paragraph four or the order for now.

19     I think what we ought to do -- Kroll, I am assuming,

20     has been involved in other circumstances like this.

21          MR. CLARK:  Oh, yes.

22          THE COURT:  And may have some

23     expertise to bring to bear in terms -- itself, in

24     terms of the type of order it might want.  But I can

1     imagine a situation that might ruffle the feathers of

2     your client or might ruffle the feathers of

3     Mr. Manwaring, where a receiver says, "I need to do

4     this.  These people on the board are hopelessly

5     driven, Your Honor, but I have taken it to them in the

6     first instance."  It could be something exactly like,

7     "We are not paying management anymore.  We have asked

8     them the direct questions about this, in terms of

9     dealing with AIG, and they have taken the Fifth."

10          MR. CLARK:  So the custodian could go

11     -- with anything that the custodian deems appropriate,

12     he can go to -- it can go to the board of directors,

13     seek approval of the board; absent unanimous approval

14     of the board, then he can come to the Court and seek

15     the Court's direction?

16          THE COURT:  Yes.  That's what I'm

17    saying.  Right now, I don't know the -- you know, that

18    is why I want the receiver or the custodian, whatever

19    you all believe will give the creditors the least

20    amount of leverage simply because we have done this,

21    not to -- I don't know if there are any creditors'

22    representatives in the room.  It's not that we don't

23    love them, but there are all kinds of acceleration

24    triggers that are often in financing instruments that,

1    you know, we don't want to inadvertently, lightly just

2    trigger, just for the -- when it doesn't have anything

3    to do with the basic solvency of the company.  But the

4    business has got to run.

5          MR. CLARK:  Right.

6          THE COURT:  If it's a fairly large

7    business, over the course of three or four months,

8    even longer, I mean, if you assume I have to

9    rationally -- I have to decide a case, and you all

10    don't get this resolved before then, then something

11    could come up where the receiver really has to act.

12    So I want something in there that addresses that.  But

13    I want Kroll's advice about that, and that of Kroll's

14    counsel.

15          MR. CLARK:  Very good, Your Honor.

16    Your Honor indicated that the litigation stay is

17    terminated.  We will put a paragraph in here saying

18    that.  We also had a -- have a motion on -- for leave

19    to actually file our second amended verified

20    complaint.

21    THE COURT:  Yes, you may do that.

22    MR. CLARK:  Very good.  I will put in

23  a provision scheduling a trial and leave it blank for

24  Your Honor.

1    THE COURT:  Work with Mr. Manwaring on

2  that.  What I'm saying is I don't think we can go at a

3  leisurely pace, but we are now almost to November.  I

4  think it's unrealistic to think we could get to trial

5  in December.

6    MR. CLARK:  Early January is -- sounds

7  fine.  I never liked Christmas and New Year's much

8  anyhow, Your Honor.

9    THE COURT:  Well, I have ADVO/

10  Valassis.  ADVO, they stick all these little things, a

11  little MAE case coming up in --

12    MR. CLARK:  A little Tyson/IBP deja vu

13  case.  I heard from my friend, Mr. Roth, about that.

14    THE COURT:  He is back, and they are

15  taking 70,000 depositions.

16    MR. CLARK:  I told him he is back and

17  he is bad.

18    THE COURT:  If you and Mr. Manwaring

19  can talk about something in January.  Needless to say,

20  this is not ideal for anybody.  And, you know, the

21  fact that we are doing this today, the Court is doing

22  this, doesn't mean that you still shouldn't try to

23  solve your problem.

24    MR. CLARK:  Very much interested in

1  doing so, Your Honor.  Thank you for Your Honor's time

2  and attention.

3                  THE COURT:  Thank you.

4                  (Recess at 11:58 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24